UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| ARON STEWARD, *Plaintiff*, | ) | **Jury Trial Demanded** |
| v. | ) | Civil Action No. 2:26-cv-403 |
| KERRIE JOHNSON, *Defendant*. | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Aron Steward, Ph.D., MBA ("Dr. Steward"), by and through her attorneys, MSK Attorneys, complains against Defendant Kerrie Johnson ("Defendant") as follows:

## INTRODUCTION

1. This is a diversity action for defamation. Dr. Steward, a licensed psychologist, seeks damages from Defendant for false and defamatory statements of fact that Defendant made about Dr. Steward to a reporter for the Vermont newspaper *Seven Days*, which *Seven Days* published on October 25, 2023, in an article entitled "The Loss of Grace" (the "Article"). A copy of the Article is attached as an Exhibit.

2. Defendant told the Article's readers, among other things, that Dr. Steward was "[g]ood at putting a stamp of legitimacy onto [a] completely barbaric practice" of restraining and isolating children at the Woodside Juvenile Rehabilitation Center; that Dr. Steward "sold" state officials on therapeutic programming that was a sham, the only "yoga" being "the brutal restraints"; that Dr. Steward "condoned and helped oversee what was done to the children at Woodside – the violent restraints, and the extended isolation in the North Unit"; and that Dr.

Steward got children to withdraw their legal cases, including by pressuring a child in her care to abandon his case in exchange for privileges.

3. Each of these statements is false. Dr. Steward did not legitimize the mistreatment of children; she spent the last year of her employment at Woodside reporting, in writing, verbally, in meetings, through reports, and to the highest levels of the Vermont Department for Children and Families, at the direction of her superiors, through protected activity, her concerns about the preventability of seclusion and restraint.

4. Dr. Steward repeatedly advised and reported, grieved and complained, to all levels of her administration that she had ideas that could ultimately reduce the use of restraint and seclusion, staff injury and assault, traumatization of the youth, length of stay and facilitate transfer of youth to more adequate and appropriate environments.

5. She did not 'sell' anyone on sham therapy; she built, at her employer's direction and taxpayers' expense, a therapeutic program based on the tenets of best-practice restorative justice and behavior therapy, that included substance abuse, specialized treatment, trauma, art, animal, meditation/mindfulness, group yoga, music therapies, and individualized treatment planning.

6. And she never pressured any child to give up a legal claim; in fact, she was tasked with convincing the children to meet with Defendant when they repeatedly refused, she repeatedly referred youth at Woodside to the Defendant for legal representation, repeatedly testified on their behalf, and facilitated the youth actively engaging in conversations with their advocates, regulators, investigators, representatives, and resources. Defendant knew these facts, or recklessly disregarded them, when she made the defamatory statements complained of herein.

## PARTIES

7. Dr. Steward is an individual who resides in Clinton County, New York, where she is domiciled and intends to remain. Dr. Steward is a citizen of the State of New York.

8. Upon information and belief, Defendant is an individual who resides in Lamoille County, Vermont, and is a citizen of the State of Vermont. At times relevant to this Complaint, Defendant was an attorney employed in the juvenile unit of the Vermont Office of the Defender General ("ODG"). Defendant is sued in her individual capacity.

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

10. This Court has personal jurisdiction over Defendant because she is domiciled in Vermont and because the claims arise from statements she made in Vermont to a Vermont publication.

11. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendant resides in this District and a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Dr. Steward and Her Work at Woodside

12. Dr. Steward holds a doctorate in counseling/school psychology and a master's degree in business administration with a focus in healthcare administration, and is a professionally licensed psychologist.

13. The Woodside Juvenile Rehabilitation Center ("Woodside"), in Essex, Vermont, was the State of Vermont's secure residential facility for youth. The Vermont Department for Children and Families ("DCF") operated Woodside. Woodside officially closed on October 1, 2020.

14. From January 2014 until May 3, 2019, Dr. Steward was employed by DCF at Woodside, first as Clinical Director and then as Assistant Director of Clinical Services, a position the Article describes as Woodside's "clinical director."

15. In or about April 2015, DCF leadership informed Dr. Steward that her professional license would be used going forward to oversee Woodside's use of so-called high-level interventions, namely seclusion and physical restraint.

16. Over the following years, Dr. Steward worked tirelessly and consistently to reduce Woodside's use of high-level interventions, including by requiring that seclusion and restraint be used only in emergencies involving an imminent risk of harm, and only after all other opportunities for response had been tried.

17. Her approach was recognized as a model: in or about 2017, the State sent Dr. Steward to present it at a juvenile justice conference, and she presented it at Norwich University alongside the then-Juvenile Defender, an ODG attorney, who described the model as cutting edge in reducing high-level interventions.

18. Woodside's Operations staff created Woodside's North Unit to house youth at imminent risk of harm to themselves or others.

19. Dr. Steward was tasked by DCF with creating a therapeutic program for the North Unit that could be delivered safely as a supplement to the actions taken by Operations staff to reduce imminent risk.

20. She did not conceive of or 'sell' DCF on the idea of offering therapeutic services in the North Unit; rather, DCF directed her to make those clinical services available to youth there at the highest possible level available given moment-to-moment safety considerations, consistent with the regulations, policies and practices of Woodside, created by organizational administration and Operations.

21. Dr. Steward drafted a North Unit clinical program that was vetted by stakeholders and routinely reexamined. She arranged with a local yoga studio to provide yoga to the youth at Woodside, and to accommodate for safety concerns in the North Unit she sent Woodside staff members to yoga training so that youth with more challenging safety behaviors could also participate in yoga.

22. She created a Restorative Justice program and culture, and to accommodate those in the North Unit, she sent one of the Operations Supervisors to further training on restorative practices and encouraged him to deliver those opportunities safely and equitably throughout the building.

23. Dr. Steward worked tirelessly to bring alternative treatments into and throughout the building in an effort to build comprehensive and holistic treatment for youth who have various needs, including music therapy, animal therapy, art therapy, substance abuse treatment, cognitive behavioral therapy (CBT), trauma-focused cognitive behavioral therapy (TF-CBT), family therapy, sexualized behavior treatment, group treatment, and incentive-based programming.

24. In each of these specialized therapies, Dr. Steward delegated the task to Operations staff to make each of these opportunities safe enough for all youth who were not imminently dangerous at the time to participate in.

25. The "clinical team" was composed of several disciplines, both in-house and contracted; all were invited to the treatment team meetings, twice per week to provide input, solutions, adaptations and accommodations for each youth at Woodside.

26. Outside stakeholders, experts, and students were always welcome at clinical team meetings, and notes for each meeting were available.

27. Individualized treatment plans were reviewed twice weekly at these clinical team meetings and frontline staff who worked every day directly with the youth were invited to advocate, share, recommend and adjust the youth's plan.

28. Special attention was always paid to how to move the youth forward safely out of the North Unit, and/or level up in other areas of the program and building.

29. Clinical services and contracted services were provided to the youth according to policy and procedure in the North Unit, and Operations staff were always willing to accommodate youth's involvement by offering safe ways of delivering care.

30. Dr. Steward presented this work repeatedly at meetings to stakeholders and DCF's chain of command.

31. Decisions about Woodside's physical plant and its operational and safety procedures were made by Woodside's Operations team, not by Dr. Steward.

32. Dr. Steward repeatedly reported to her managers and administrators that the structure of the building – secure and locked treatment for persistently and chronically mentally ill youth in a criminal justice setting with documented and horrific psychological trauma histories and operational constraints – impeded her ability to deliver a therapeutic program that met appropriate standards for every youth across time and shift and through the variable phases of recovery for each youth.

33. Dr. Steward repeatedly reported to AHS (Agency of Human Services) – FSD (Family Services Division) – RLSI (Residential Licensing and Special Investigations) that regulating their own program impeded her ability to make adequate and meaningful changes with regard to quality improvement.

## B. Dr. Steward Reported Her Concerns About Seclusion and Restraint

34. When Woodside's use of seclusion and restraint began to increase in the spring of 2018, Dr. Steward began reporting her concerns.

35. From June 2018 until she left Woodside, Dr. Steward reported her concerns about the overuse of seclusion and restraint – in writing, in meetings, and through emails, text messages, phone messages and letters – to the DCF Commissioner, the DCF Deputy Commissioner, DCF Counsel, regulators, advocates and routinely through Dr. Steward's chain of command.

36. Dr. Steward told her superiors repeatedly that she would resign if forced to continue working under those conditions.

37. She began looking for other employment in July 2018.

38. She left Woodside on May 3, 2019.

39. Before she left Woodside, Dr. Steward, at the direction of her superiors, compiled and submitted to DCF a series of documents, reports, timelines and incidents, nearly 1,000 pages long, outlining her concerns about incidents and practices at Woodside that had increased the use of seclusion and restraint.

40. In meetings at which Defendant was present, in meetings between the two of them that Defendant requested, and in communications with her superiors, Dr. Steward openly agreed with several of Defendant's own concerns about Woodside, including concerns about the structure of the building, the detention of youth with significant mental-health needs, Dr. Steward's inability

to transfer youth to more specialized and adequate settings for their needs, and the use of high-level interventions.

41. Dr. Steward never pressured, induced, or encouraged any youth at Woodside to withdraw or dismiss any legal case.

42. She never promised any youth privileges in exchange for dismissing a case.

43. She never told any youth not to authorize his or her lawyer to obtain clinical records.

44. And she never praised any youth for declining to cooperate with investigators.

45. On the contrary, on numerous occasions and at Defendant's request, Dr. Steward encouraged youth who were refusing to meet with Defendant to meet with Defendant, and helped de-escalate and stabilize youth before and after their meetings with Defendant.

46. Dr. Steward's superiors advised her repeatedly to report her concerns to the Agency of Human Services' Human Resources Department, bar counsel, advocates, and regulators, and to participate in consultations about the traumatic impact on the staff from working in a hostile environment where they were subjected to the unnecessary trauma of high-level interventions.

47. Dr. Steward repeatedly advised regulators, investigators, and administrators that the youth and staff were suffering without the necessary changes being made and that no amount of clinical programming could aid the staff and youth in avoiding the dysfunction and toxicity of requiring so many North Unit placements, high-level interventions, increases in staff assaults, staff injury, suicidal gestures, and harm to all involved.

48. Dr. Steward had been a vicarious and secondary trauma consultant to the DCF districts from 2015 to 2018.

49. Between 2018 and the day that she resigned, Dr. Steward repeatedly reported to her managers and administrators that the level of secondary and vicarious trauma was extraordinary at Woodside.

**C. Defendant's Animus Toward Dr. Steward**

50. Defendant represented youth held at Woodside and litigated against DCF concerning conditions there.

51. In June 2018, when Dr. Steward was advised to begin documenting and reporting the concerns she had regarding Defendant's behavior, Defendant began targeting and retaliating against Dr. Steward.

52. This retaliation escalated substantially over the following months while Dr. Steward was reporting her concerns and looking for other employment.

53. Dr. Steward was following her mandated reporter requirements, ethics, and directions by her superiors to document that Defendant's behavior and actions were increasing high-level interventions being required in the building.

54. Dr. Steward was required to report the statements that Defendant was making, including: "I went to law school just so I can take down DCF and get back at Karen Shea for a decision she made," and "I asked to be placed at Woodside so I can take on DCF and because the kids here are the most vulnerable and in need."

55. Defendant began requiring Dr. Steward to comply and assist with her demands, including having the children transferred out, finding alternative treatment solutions, having them admitted to inpatient psychiatric facilities, and achieving leveling up in the programming.

56. Dr. Steward did her best to support the youth and their legal representatives' requests, but there were many barriers to accomplishing all of Defendant's demands and requirements.

57. Upon information and belief, while Dr. Steward was employed at Woodside, Defendant told youth at Woodside that she (Defendant) would ensure that Dr. Steward lost her license and never practiced again.

58. Youths reported these statements to Dr. Steward, who in turn reported them to DCF leadership.

59. The youths stated to Dr. Steward that Defendant was "using" them and their increasingly unsafe behaviors toward themselves and others to file motions in court and eventually close Woodside, as that was Defendant's "plan."

60. Dr. Steward reported these concerns to her managers and administrators through emails, conversations, incident reports and phone calls.

61. In the months leading up to her resignation, Dr. Steward received an adjusted work schedule from the State to reduce her contact with Defendant, as Dr. Steward's manager, Woodside Juvenile Rehabilitation Center Director Jay Simons, had determined that Defendant had created a hostile and harassing working environment, specifically for Dr. Steward.

62. Dr. Steward participated in a "safety planning" meeting at DCF's central office with DCF's "safety ambassador," Ms. Shannon Morton, to generate a plan for her professional and personal safety from Defendant.

63. Dr. Steward was also granted time by DCF each week to attend mental health therapy during work to continue managing the stress and harm Dr. Steward was experiencing as a result of Defendant's harassment.

64. In a safety planning meeting, Dr. Steward was advised by DCF to obtain security cameras at her home and report to law enforcement if Defendant or someone sent by Defendant arrived at her residence.

65. In the weeks leading up to Dr. Steward's resignation, Defendant sent a person to Dr. Steward's home to serve a subpoena for an upcoming court appearance.

66. On information and belief, Defendant sent no other witnesses a subpoena at their homes, as they were served at their work sites.

67. When the person arrived with the subpoena, she threw the packet of papers at Dr. Steward, who was holding her toddler at the time, hitting both with the papers, and then ran away across Dr. Steward's lawn.

68. Per DCF's prior recommendation, described in paragraph 64, above, Dr. Steward reported this incident to the Burlington Police Department.

69. In January 2020, after Dr. Steward had left Woodside, ODG filed a complaint against Dr. Steward with the Vermont Office of Professional Regulation ("OPR").

70. Upon information and belief, Defendant participated in the preparation of that complaint.

71. The charges that OPR ultimately brought against Dr. Steward in January 2023 concerned statements about her credentials.

72. OPR did not charge Dr. Steward with any misconduct relating to the treatment of children at Woodside, the use of seclusion or restraint, or the North Unit's therapeutic programming.

73. Upon information and belief, on or about October 12, 2023, which was less than two weeks before the Article was published, Defendant, or another ODG attorney acting with her, telephoned Dr. Steward's workplace in New York.

74. The caller told Dr. Steward's frontline employees, who, at that time, answered the phone outside the locked psychiatric adult unit, that "[s]he is not who she says she is," "there is no such position as chief of psychology at your hospital," "I need to investigate an ongoing licensing violation and complaint against her," and demanded Dr. Steward's job description and résumé.

75. The attorney provided a cell phone number that was assigned to the ODG office at the time, and identified herself as Attorney Kelly Green.

76. Ms. Green affirmed there were two female attorneys who needed the information for investigation of an "ongoing licensing violation and complaint against" Dr. Steward.

77. In the Article itself, Defendant explained her view of the value of reputational harm: "The reputational damage that comes from being named publicly as presiding over or defending Woodside gets attention." (Exhibit at 92.)

**D. <u>The *Seven Days* Article</u>**

78. *Seven Days* is a newspaper published in Burlington, Vermont, and distributed in print and online throughout Vermont and beyond.

79. On October 25, 2023, *Seven Days* published the Article, written by reporter Joe Sexton, in print and on its website at https://www.sevendaysvt.com/news/woodside-investigation-violence-and-isolation-at-vermonts-juvenile-lockup-39222023/, where it remains available to the public today.

80. Upon information and belief, before the Article was published, Defendant gave one or more interviews to Mr. Sexton in which she made the statements attributed to her below, knowing and intending that they would be published.

81. The Article identifies Defendant as "a lawyer with the Vermont Office of the Defender General's juvenile unit," lending her statements the apparent authority of a lawyer with firsthand access to Woodside. (Exhibit at 9.)

82. The Article identifies Dr. Steward by name, describes her as Woodside's clinical director, and identifies her then-current employer. (Exhibit at 9, 82.)

**E. <u>Defendant's Defamatory Statements</u>**

83. *Statement 1.* The Article states:

> "Good at putting a stamp of legitimacy onto this otherwise completely barbaric practice," Johnson, the lawyer with the Defender General's Office, said of Steward's role in the treatment of children at Woodside. (Exhibit at 13.)

84. *Statement 2.* The Article states:

> Johnson said Steward sold DCF superiors and others on the idea that the North Unit at Woodside would offer children yoga sessions, as well as art and music therapy. Johnson said Steward called the North Unit a "low-stimulation environment," what Johnson called "doublespeak" for solitary confinement.
>
> Johnson said that in all her time in the North Unit, the only "yoga" she'd seen was "the brutal restraints" and the only music she heard was "staff playing a radio in the hallway for certain kids who demonstrated good behavior."
>
> "The closest thing to art therapy that happened back there were kids using their fingernails to chip away at the paint on the cinder block walls inside their cells," she said. (Exhibit at 48.)

85. *Statement 3.* The Article states:

> Johnson said she documented how Simons and Steward got children to withdraw their cases. In one instance, Johnson, on behalf of a

> damaged boy kept for months in the North Unit's isolation cells, asked a judge to end the restraint policies that Simons had enforced. The boy later told his lawyers that Steward met with him at Woodside and told him that he had no chance at prevailing in court. He said she promised to give him more privileges if he told Johnson to dismiss his case. He said she also told him not to authorize his lawyer to gain access to his clinical notes at Woodside. Simons, the boy said, joined the pressure campaign, and the boy agreed to write a letter telling Johnson to withdraw her filing. The boy later refused to talk to investigators working on the complaint of another child. He said Steward applauded his "good choice." (Exhibit at 59.)

86. Upon information and belief, Defendant, who was the boy's lawyer, was the source of the account of the boy's alleged statements in Statement 3.

87. *Statement 4*. The Article states:

> The Defender General's office said Woodside's clinical director, Aron Steward, condoned and helped oversee what was done to the children at Woodside — the violent restraints, and the extended isolation in the North Unit — despite ample research detailing the harm done to children kept in such conditions. In 2020, that office accused Steward of having repeatedly testified falsely under oath about her professional credentials, including during proceedings that involved the placement and detention of children at Woodside. In January 2023, the Vermont Office of Professional Regulation cited Steward's alleged misrepresentations and charged her with "engaging in conduct of a character likely to deceive, defraud or harm the public." (Exhibit at 12.)

88. Upon information and belief, Defendant, who participated in the creation of the licensure complaint, was the source of the statement, "condoned and helped oversee what was done to the children at Woodside — the violent restraints, and the extended isolation in the North Unit — despite ample research detailing the harm done to children kept in such conditions."

89. Statements 1, 2, 3 and 4 are referred to collectively as the "Defamatory Statements."

## F. <u>The Defamatory Statements Are False</u>

90. Statement 1 asserts, and was understood by readers to assert, that Dr. Steward approved and endorsed the abusive restraint and isolation of children at Woodside and used her

professional standing to make that abuse appear legitimate. That assertion is false. As detailed above, Dr. Steward worked to reduce the use of seclusion and restraint and, when its use increased, reported her concerns repeatedly and at the highest levels of DCF until she resigned.

91. Statement 1 is not a statement of pure opinion. It was made by an attorney whom the Article presents as having firsthand knowledge of conditions at Woodside, it describes Dr. Steward's actual conduct in her professional role, and it implies the existence of undisclosed facts – that Dr. Steward approved of, endorsed, and lent her credentials to the abuse of children – that are false and capable of being proven false.

92. Statement 2 asserts, and was understood by readers to assert, that Dr. Steward deceived her DCF superiors by promoting therapeutic programming that did not exist, that she used therapeutic labels to disguise solitary confinement, and that the only "yoga" in the North Unit was violent restraint. Those assertions are false. As detailed above, Dr. Steward did not 'sell' DCF on the North Unit's programming; she was directed by DCF to create it; and the program she created included actual yoga, music, and individualized clinical planning.

93. Statement 3 asserts, and was understood by readers to assert, that Dr. Steward coerced children in her care to withdraw their legal cases, including by offering a child privileges in exchange for dismissing his case and discouraging him from authorizing his lawyer's access to his clinical records. Those assertions are false. As detailed above, Dr. Steward never had any such conversation with any youth at Woodside.

94. Statement 4 asserts, and was understood by readers to assert, that Dr. Steward approved, directed, accepted, allowed, or silently overlooked the practices and helped to abuse the children in her care with violent restraints and extended isolation. Those assertions are false. As detailed above, Dr. Steward repeatedly reported, through protected activity, that the increase in

restraints and seclusion was preventable and avoidable, and she offered repeated solutions. Further, she never ordered, directed or approved any planned use of restraint or seclusion. By institutional policy, she was required to sign all of the emergency procedures after they occurred.

**G. <u>Defendant Acted With Actual Malice</u>**

95. Defendant made each of the Defamatory Statements with knowledge of its falsity or with reckless disregard for whether it was true or false.

96. Defendant knew that Dr. Steward had raised concerns about the use of seclusion and restraint at Woodside, in part because Dr. Steward voiced agreement with Defendant's concerns in meetings Defendant attended.

97. Defendant, who by her own account spent substantial time in the North Unit, knew or recklessly disregarded that the North Unit's therapeutic programming was created at DCF's direction and included actual yoga, music and clinical planning.

98. Defendant knew that Dr. Steward had, at Defendant's request, encouraged youths to meet with Defendant, which is irreconcilable with Statement 3.

99. Defendant harbored personal ill will toward Dr. Steward, as shown by Defendant's above-described statements to youths that she would see that Dr. Steward lost her license, and her stated view, quoted above, that public reputational damage to those associated with Woodside "gets attention." (Exhibit at 92.)

100. On April 25, 2019, after Dr. Steward had announced her resignation, obtained a safety plan to protect her from Defendant, and obtained an adjusted work schedule to reduce the harassment to which Defendant was subjecting her, Defendant sent an email to one of Dr. Steward's colleagues – another supervisor in DCF, Larry Reed – in which Defendant disparaged and maligned Dr. Steward's professionalism.

101. In sending this email to Mr. Reed, Defendant copied the social worker attached to a youth with whom Dr. Steward was working.

102. That same day, Mr. Reed forwarded Defendant's April 25, 2019 email to several DCF administrators, including DCF Commissioner Ken Schatz.

103. Also that same day, DCF Commissioner Ken Schatz responded to Defendant via email. Commissioner Schatz wrote to Defendant that her conduct was "completely out of line" and "wholly unprofessional."

104. Defendant made the Defamatory Statements for the purpose of inflicting reputational damage on Dr. Steward, first in an effort to harass her while she was employed, and then, following Dr. Steward's resignation, to ensure that her reputation, credibility, and livelihood were damaged as retaliation for Dr. Steward engaging in protected activity critical of Defendant.

105. In the alternative, and to the extent Dr. Steward is found to be a private figure for purposes of this action, Defendant was at least negligent in making the Defamatory Statements.

### H. The Defamatory Statements Are Not Privileged

106. Defendant made the Defamatory Statements in interviews with a newspaper reporter, not in the course of any judicial, quasi-judicial, or legislative proceeding. The Defamatory Statements are not privileged, and any privilege that might otherwise apply was abused and lost by Defendant's actual malice and ill will.

107. In making the Defamatory Statements, Defendant was not acting within the scope of her employment with ODG.

108. Giving press interviews disparaging a former DCF employee, years after that employee had left Woodside, was not conduct of the kind Defendant was employed to perform, did not occur within the authorized time and space limits of her employment, and was actuated by

Defendant's personal animus toward Dr. Steward rather than by a purpose to serve ODG or its clients.

109. In the alternative, Defendant's conduct in making knowingly or recklessly false statements about Dr. Steward for the purpose of damaging her reputation constitutes willful misconduct within the meaning of 12 V.S.A. § 5602(b).

## I. <u>Dr. Steward's Damages</u>

110. The Article was widely read in Vermont and northern New York. It has remained continuously available online since its publication.

111. The Defamatory Statements are defamatory per se because they impute to Dr. Steward conduct incompatible with the proper exercise of her profession as a psychologist and clinician entrusted with the care of children, and they tend to injure her in that profession.

112. As a direct and proximate result of the Defamatory Statements, Dr. Steward has suffered injury to her reputation and professional standing, loss of employment opportunities and income, humiliation, and emotional distress.

## <u>COUNT I</u>

### Defamation – Statement 1

113. Dr. Steward repeats and incorporates each of the preceding paragraphs.

114. Defendant made Statement 1 to a reporter for *Seven Days*, knowing and intending that it would be published, and it was published to third parties in the Article.

115. Statement 1 is of and concerning Dr. Steward, is false, and is defamatory.

116. Defendant made Statement 1 with knowledge of its falsity or with reckless disregard for its truth or falsity, and, at a minimum, negligently.

117. Statement 1 is not privileged.

118. Statement 1 is defamatory per se, and Dr. Steward has suffered actual harm, including injury to her reputation, as a direct and proximate result of it.

119. Defendant acted with actual malice, including personal ill will toward Dr. Steward and reckless or wanton disregard of her rights, entitling Dr. Steward to punitive damages.

## COUNT II

### Defamation – Statement 2

120. Dr. Steward repeats and incorporates each of the preceding paragraphs.

121. Defendant made Statement 2 to a reporter for *Seven Days*, knowing and intending that it would be published, and it was published to third parties in the Article.

122. Statement 2 is of and concerning Dr. Steward, is false, and is defamatory.

123. Defendant made Statement 2 with knowledge of its falsity or with reckless disregard for its truth or falsity, and, at a minimum, negligently.

124. Statement 2 is not privileged.

125. Statement 2 is defamatory per se, and Dr. Steward has suffered actual harm, including injury to her reputation, as a direct and proximate result of it.

126. Defendant acted with actual malice, including personal ill will toward Dr. Steward and reckless or wanton disregard of her rights, entitling Dr. Steward to punitive damages.

## COUNT III

### Defamation – Statement 3

127. Dr. Steward repeats and incorporates each of the preceding paragraphs.

128. Defendant made Statement 3 to a reporter for *Seven Days*, knowing and intending that it would be published, and it was published to third parties in the Article.

129. Statement 3 is of and concerning Dr. Steward, is false, and is defamatory.

130. Defendant made Statement 3 with knowledge of its falsity or with reckless disregard for its truth or falsity, and, at a minimum, negligently.

131. Statement 3 is not privileged.

132. Statement 3 is defamatory per se, and Dr. Steward has suffered actual harm, including injury to her reputation, as a direct and proximate result of it.

133. Defendant acted with actual malice, including personal ill will toward Dr. Steward and reckless or wanton disregard of her rights, entitling Dr. Steward to punitive damages.

## COUNT IV

### Defamation – Statement 4

134. Dr. Steward repeats and incorporates each of the preceding paragraphs.

135. Upon information and belief, Defendant made Statement 4 to a reporter for *Seven Days*, knowing and intending that it would be published, and it was published to third parties in the Article.

136. Statement 4 is of and concerning Dr. Steward, is false, and is defamatory.

137. Upon information and belief, Defendant made Statement 4 with knowledge of its falsity or with reckless disregard for its truth or falsity, and, at a minimum, negligently.

138. Statement 4 is not privileged.

139. Statement 4 is defamatory per se, and Dr. Steward has suffered actual harm, including injury to her reputation, as a direct and proximate result of it.

140. Defendant acted with actual malice, including personal ill will toward Dr. Steward and reckless or wanton disregard of her rights, entitling Dr. Steward to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Aron Steward respectfully requests that the Court enter judgment in her favor and against Defendant Kerrie Johnson and award:

(a) compensatory damages, including presumed damages, in an amount to be determined at trial, but in excess of $75,000;

(b) punitive damages in an amount to be determined at trial;

(c) pre-judgment and post-judgment interest as allowed by law;

(d) costs of this action; and

(e) such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

DATED at Burlington, Vermont this 26th day of October, 2026.

Respectfully submitted,

MSK ATTORNEYS

By: /s/ *Daniel A. Seff*
Daniel A. Seff, Esq.

275 College Street, P.O. Box 4485
Burlington, VT 05406-4485
Phone: 802-861-7000 (x1190)
Fax: 802-861-7007
Email: dseff@mskvt.com

*Attorneys for Plaintiff Aron Steward*